IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 2:19-347 |
| | ) | |
| | ) | 18 U.S.C. § 1349 |
| vs. | ) | 18 U.S.C. § 1343 |
| | ) | |
| **JAMES THOMAS BRAMLETTE** | ) | |
| a/k/a JT Bramlette | ) | |
| **ANTHONY MARK HARTMAN** | ) | |
| **TRAVIS KOZLOWSKI** | ) | |
| | | **INDICTMENT** |

## COUNT 1
(Conspiracy to Commit Wire Fraud)

THE GRAND JURY CHARGES:

1. From in or about 2014 through 2017, in the District of South Carolina and elsewhere, the Defendants, **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette, ANTHONY MARK HARTMAN,** and others known and unknown to the Grand Jury, knowingly and willfully and with intent to defraud, combined, conspired, confederated, and agreed together to execute and attempt to execute a scheme and artifice to defraud, by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme transmitted and caused to be transmitted by means of wire communications in interstate commerce, writings, signs, and signals in violation of Title 18, United States Code, Sections 1343 and 1349.

1

## BACKGROUND

At all times relevant to this Conspiracy:

2. **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette**, was the owner of the Pelorus Group, LLC. The Pelorus Group was a real estate development company based in Salt Lake City, Utah.

3. **ANTHONY MARK HARTMAN** was the owner of Private Placement Capital Notes II, LLC. (herein PPCN) and Stone Mountain Equities, LLC. PPCN and Stone Mountain Equities were investment companies formed in Colorado and Nevada.

4. Melrose Resort was a 680-acre property on Daufuskie Island, S.C. Melrose Resort overlooked the Atlantic Ocean and included a Jack Nicklaus-designed golf course, an equestrian center, and a beachfront Inn. Melrose Resort was located in a remote coastal area and was accessible only by boat. Melrose Resort struggled financially since it was developed in the 1980s. Melrose Resort closed in 2008 and filed for bankruptcy in 2009.

5. From 2011 through 2013, **BRAMLETTE** purchased four parcels that comprised Melrose Resort by borrowing approximately $17.5 million in high-interest loans from a Dutch lender. **BRAMLETTE** did not put any of his own money into the purchase of Melrose Resort. In or around 2013, **HARTMAN**, through his company PPCN, became a part-owner with **BRAMLETTE** in Melrose Holdings, which was a holding company that owned the majority of Melrose Resort.

6. **BRAMLETTE** managed Melrose Resort and marketed it to private equity firms in an attempt to refinance and/or sell the resort.

7. **HARTMAN** and **BRAMLETTE**, and others known and unknown to the Grand Jury, raised more than $10 million from individual investors to invest in Melrose Resort, and they caused these funds to be wired in interstate commerce. **HARTMAN** and **BRAMLETTE** raised funds for Melrose Resort by issuing promissory notes from PPCN, Stone Mountain Equities, and the Pelorus Group. **BRAMLETTE** and **HARTMAN** told investors that their money would be used to renovate Melrose Resort and that they would be repaid with interest when the resort was refinanced or sold.

8. When **BRAMLETTE** purchased Melrose Resort after its bankruptcy, the resort was in poor condition and needed substantial renovations. By 2013, Melrose Resort was in dire financial condition, and it lost money every month. The resort struggled to pay employees, vendors, property taxes, insurance, payroll taxes, and utilities. Melrose Resort could not pay its mortgage payments to the Dutch lender, and in April 2014, the Dutch lender obtained a foreclosure judgment of $27 million against Melrose Resort and **BRAMLETTE**. In order to delay the foreclosure, **BRAMLETTE** agreed to pay the Dutch lender $100,000 per month to hold the foreclosure in abeyance.

9. **BRAMLETTE'S** attempts to refinance Melrose Resort were unsuccessful, and the financial condition of the resort continued to deteriorate. In the fall of 2014,

3

**BRAMLETTE** and **HARTMAN** borrowed an additional $700,000 from a group of attorneys in Salt Lake City, Utah. To secure this loan, **BRAMLETTE** and **HARTMAN** transferred their ownership interests in Melrose Holdings to the Salt Lake City attorneys. **BRAMLETTE** and **HARTMAN** defaulted on this loan, and in May 2015, they lost all ownership in Melrose Resort.

## SCHEME TO DEFRAUD

10. It was part of the scheme to defraud that **BRAMLETTE** and **HARTMAN** continued to raise money for Melrose Resort after they lost ownership of the property in an attempt to regain the resort. **BRAMLETTE** and **HARTMAN** failed to disclose to investors that they lost ownership in Melrose Resort in the fall of 2014, and **BRAMLETTE** and **HARTMAN** falsely represented that they had an ownership interest in the resort long after the fact. In an email to an investor in March 2016, **HARTMAN** falsely represented that "[o]ur team now owns and controls" Melrose Resort and that "the asset is now owned by our team." In an email to another investor in August 2015, **HARTMAN** falsely stated that "[w]ithout that extra investment we could have lost the property and then would have had issues on principal payback." In an email to an investor and **HARTMAN** in September 2016, **BRAMLETTE** falsely stated that "I will tell you by us not selling the farm yet and having to give up a lot of the equity we are going to capture big returns on Melrose over the next 5 years." In January 2017, **BRAMLETTE** falsely represented to investors that he had assigned them a 1.25% "membership interest"

4

in Melrose Holdings even though **BRAMLETTE** had no ownership in the resort to assign.

11. It was part of the scheme that **BRAMLETTE** and **HARTMAN** frequently discussed the desperate financial condition of Melrose Resort. After the utility company notified **BRAMLETTE** that it was turning off the power to Melrose Resort in January 2014 due to lack of payment, **BRAMLETTE** emailed the notice to **HARTMAN** and stated that "I'm sorry guys but I can't hold these any longer." After the Dutch lender demanded an additional $200,000 not to foreclose in June 2015, **BRAMLETTE** forwarded the email to **HARTMAN** and stated that "we are screwed." In February 2016, the water company shut off the water to Melrose Resort for failure to pay $33,000 in past due water bills. **BRAMLETTE** emailed this notice to **HARTMAN** and stated "f**k." Despite these severe financial problems, **BRAMLETTE** and **HARTMAN** painted an optimistic picture of Melrose Resort, and they continued to raise money from investors for the resort. Throughout the conspiracy, **BRAMLETTE** and **HARTMAN** repeatedly promised investors that Melrose Resort was on the cusp of being refinanced even though every attempt to refinance or sell the resort had failed.

12. It was further part of the scheme that **BRAMLETTE** used more than $1.5 million that was invested in Melrose Resort for his personal use, including the mortgage payments on his residence in Utah, the car payments for his Range Rover, his daughter's college tuition, his country club dues, the rent for his girlfriend's

5

apartment, and other living expenses. **BRAMLETTE** caused these funds to be wired in interstate commerce. It was part of the scheme that **BRAMLETTE** used these funds for his personal use without the investors' knowledge and during periods when he failed to pay employees, vendors, and contractors at Melrose Resort.

13. It was further part of the scheme that **HARTMAN** encouraged investors to use their retirement savings to invest in Melrose Resort through PPCN and Stone Mountain Equities. Despite the grim financial condition of Melrose Resort, **HARTMAN** misrepresented the financial risks of investing in the resort. When asked by an investor in August 2015 about the risks of investing in Melrose Resort, **HARTMAN** replied in an email that "[t]he risk is little to none of losing principal" and that "I would make you whole out of my other assets" if Melrose Resort faltered. In an email to another investor in March 2013, **HARTMAN** falsely represented that "[w]e now have assets that total more than five times the amount of investor notes, so we have a very solid cushion."

14. It was further part of the scheme that **BRAMLETTE** personally guaranteed some of the promissory notes issued by the Pelorus Group even though he was in bankruptcy in 2012, had poor credit, and lacked the financial ability to honor these guarantees.

15. It was further part of the scheme that **BRAMLETTE** and **HARTMAN** falsely represented to investors that their funds would be used to renovate Melrose Resort and acquire additional property for the resort when much of the funds were used to

pay the Dutch lender not to foreclose, to pay previous investors, and for **BRAMLETTE'S** personal use. As a result, very few improvements were made to Melrose Resort, and in March 2017, the Resort filed for bankruptcy. The resort is now dilapidated and largely abandoned.

16. Due to this conspiracy to commit wire fraud, investors in Melrose Resort lost millions of dollars.

In violation of Title 18, United States Code, Sections 1343 and 1349.

## COUNT 2
(Wire Fraud)

THE GRAND JURY FURTHER CHARGES:

1. The allegations of Count 1 are incorporated herein:

2. In or about September 2016, in the District of South Carolina and elsewhere, the defendant, **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette**, knowingly and willfully devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false pretenses, representations, and promises.

3. During this period, Melrose Resort owed $502,759 in past due property taxes to the Beaufort County Treasurer's Office.

4. As a result of this tax delinquency, the Beaufort County Treasurer's Office notified the Pelorus Group that Melrose Resort would be auctioned at a county tax sale if the past due taxes were not paid.

5. On September 20, 2016, an employee of the Pelorus Group emailed Bramlette this notice and stated that "we have a week from this Friday, September 30th to pay these taxes, which total $502,759.40 or the properties go up for sale on Monday, October 3rd, 2016." **BRAMLETTE** forwarded this email to **HARTMAN** and **KOZLOWSKI** and stated that "I have no idea how to deal with this."

6. It was part of the scheme to defraud that in order to prevent Melrose Resort from being sold at this tax sale, **BRAMLETTE** manufactured a wire receipt that falsely represented that the Pelorus Group had paid the property taxes and had wired $502,759 to the bank account of the Beaufort County Treasurer's Office. In reality, the Pelorus Group had only $121.07 in its bank account at this time, and these funds were not wired as **BRAMLETTE** represented.

7. It was part of the scheme to defraud that **BRAMLETTE** directed an employee of the Pelorus Group to email the fraudulent wire receipt to the Beaufort County Treasurer's Office right before the deadline in order to have Melrose Resort removed from the tax sale on October 3, 2016.

8. On or about September 30, 2016, in the District of South Carolina and elsewhere, **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette**, for the purpose of executing the aforesaid scheme and artifice to defraud, knowingly caused a wire communication to be transmitted in interstate commerce from Utah to South Carolina by causing an employee of the Pelorus Group to email a fraudulent wire receipt to the Beaufort County Treasurer's Office.

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 3
(Wire Fraud)

THE GRAND JURY FURTHER CHARGES:

1. The allegations of Count 1 are incorporated herein:

2. **TRAVIS KOZLOWSKI** was a partner at the Pelorus Group and was responsible for investor relations. **KOZLOWSKI** raised money for Melrose Resort with **BRAMLETTE**.

3. From in or about June 2013 through July 2015, in the District of South Carolina and elsewhere, the Defendants, **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette** and **TRAVIS KOZLOWSKI**, knowingly and willfully devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false pretenses, representations, and promises.

4. It was part of the scheme to defraud that **BRAMLETTE** sought to acquire a 12-acre parcel of land that was located next to the entrance to Melrose Resort. This land formerly housed a golf academy (herein academy property), and the owner of the academy property was in default of the mortgage.

5. It was part of the scheme that **KOZLOWSKI** convinced Investor 1 and Investor 2 to purchase the loan on the academy property from the bank at the discount price of $500,000, and later acquire the academy property out of foreclosure. It was part of the scheme that **BRAMLETTE** and **KOZLOWSKI** caused Investor 1 and Investor 2 to

9

wire these funds in interstate commerce from Utah to South Carolina.

6. It was further part of the scheme that **BRAMLETTE** promised to purchase the academy property from Investor 1 and Investor 2 for $900,000 once Melrose Resort was refinanced.

7. It was further part of the scheme that after Investor 1 and Investor 2 acquired the academy property out of foreclosure, **KOZLOWSKI** transferred the deed on the academy property to "Melrose Academy, LLC." without the knowledge or consent of Investor 1 and Investor 2

8. It was further part of the scheme that in July 2015, **BRAMLETTE** and **KOZLOWSKI** borrowed $350,000 from ACP South Carolina, LLC. In order to obtain this loan, **BRAMLETTE** and **KOZLOWSKI** pledged the academy property as security for the loan without the knowledge or consent of Investor 1 and Investor 2, and ACP South Carolina, LLC. received a lien on the academy property.

9. After **BRAMLETTE** and **KOZLOWSKI** pledged the academy property, which they did not own or have the authority to pledge, they defaulted on the $350,000 loan. As a result, ACP South Carolina, LLC. does not have full collateral for the $350,000 loan, and Investor 1 and Investor 2 do not own the academy property free and clear as they did before the scheme to defraud.

10. On or about July 15, 2015, in the District of South Carolina and elsewhere, **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette and TRAVIS KOZLOWSKI**, aiding and abetting each other, for the purpose of executing the aforesaid scheme and artifice

to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises knowingly caused $350,000 to be transferred by wire communications in interstate commerce.

In violation of Title 18, United States Code, Sections 1343 and 2.

A  True  BILL

███████████████

*/s/ J.D. Rowell for*
SHERRI A. LYDON (MRD)
UNITED STATES ATTORNEY

11

## FORFEITURE

CONSPIRACY/WIRE FRAUD:

Upon conviction to violate Title 18, United States Code, Sections 1343 and 1349 as charged in this Indictment, the Defendants, **JAMES THOMAS BRAMLETTE, a/k/a JT Bramlette, ANTHONY MARK HARTMAN** and **TRAVIS KOZLOWSKI**, shall forfeit to the United States, any property, real or personal, which constitutes or is derived from any proceeds the Defendant obtained, directly or indirectly, as the result of such violations and any property traceable to such property.

PROPERTY:

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the property which is subject to forfeiture upon conviction of the Defendants for the violations charged in this Indictment includes, but is not limited to, the following:

### FORFEITURE JUDGMENT/ PROCEEDS:

A sum of money equal to all proceeds the Defendants obtained directly or indirectly as the result of the offenses charged in this Indictment, and all interest and proceeds traceable thereto, and/or that such sum equals all property derived from or traceable to their violations of 18 U.S.C. §§ 1343 and 1349.

SUBSTITUTE ASSETS:

If any of the property described above, as a result of any act or omission of the Defendant:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or

     e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the Defendants up to the value of the forfeitable property.

  Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).